Paul M. Basta (*pro hac vice* pending)
Lewis R. Clayton (*pro hac vice* pending)
Robert A. Britton (*pro hac vice* pending)
William A. Clareman (*pro hac vice* pending)
Sean A. Mitchell (*pro hac vice* pending)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
        lclayton@paulweiss.com
        rbritton@paulweiss.com
        wclareman@paulweiss.com
        smitchell@paulweiss.com

Jason S. Brookner
Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
**GRAY REED & McGRAW LLP**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email: jbrookner@grayreed.com
        lwebb@grayreed.com

*Counsel to Prudential Capital Partners IV, L.P.,
Prudential Capital Partners Management Fund IV,
L.P., Prudential Capital Partners (Parallel Fund) IV,
L.P., and Falcon Strategic Partners IV, LP, as
Petitioning Creditors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | |
| | § | Chapter 11 |
| AMERICAN ACHIEVEMENT CORPORATION, | § § | |
| Involuntary Debtor. | § § § | Case No. 21-30058 (___) |
| In re: | § § § | |
| | § | Chapter 11 |
| BRADDOCK HOLDING LLC, | § § | |
| Involuntary Debtor. | § § § | Case No. 21-30060 (___) |
| In re: | § § § | |
| | § | Chapter 11 |
| CBI NORTH AMERICA, INC., | § § | |
| Involuntary Debtor. | § § § | Case No. 21-30061 (___) |

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| COMMEMORATIVE BRANDS, INC., | § | |
| | § | Case No. 21-30062 (___) |
| Involuntary Debtor. | § | |
| | § | |
| In re: | § | |
| | § | Chapter 11 |
| GASPARD LTD., | § | |
| | § | Case No. 21-30063 (___) |
| Involuntary Debtor. | § | |
| | § | |
| In re: | § | |
| | § | Chapter 11 |
| ICONIC GROUP, INC., | § | |
| | § | Case No. 21-30064 (___) |
| Involuntary Debtor. | § | |
| | § | |
| In re: | § | |
| | § | Chapter 11 |
| GASPARD & SONS, INC. | § | |
| | § | Case No. 21-30065 (___) |
| Involuntary Debtor. | § | |
| | § | |
| In re: | § | |
| | § | Chapter 11 |
| GASPARD AND SONS MAYAGUEZ INC. | § | |
| | § | Case No. 21-30066 (___) |
| Involuntary Debtor. | § | |
| | § | |
| In re: | § | |
| | § | Chapter 11 |
| TAYLOR PUBLISHING MANUFACTURING, L.P. | § | |
| | § | Case No. 21-30067 (___) |
| Involuntary Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| TAYLOR PUBLISHING COMPANY, | § § | Case No. 21-30068 (___) |
| Involuntary Debtor. | § § § | |
| In re: | § § § | Chapter 11 |
| TAYLOR MANUFACTURING HOLDINGS, LLC | § § | Case No. 21-30069 (___) |
| Involuntary Debtor. | § § § | |
| In re: | § § § | Chapter 11 |
| WILLISE CAP & GOWN LLC, | § § | Case No. 21-30070 (___) |
| Involuntary Debtor. | § § § | |
| In re: | § § § | Chapter 11 |
| UNIVERSITY CAP & GOWN CO., INC. | § § | Case No. 21-30071 (___) |
| Involuntary Debtor. | § § § | |
| In re: | § § § | Chapter 11 |
| TP HOLDING CORP., | § § | Case No. 21-30072 (___) |
| Involuntary Debtor. | § § § | |
| In re: | § § § | Chapter 11 |
| TAYLOR SENIOR HOLDING CORP., | § § | Case No. 21-30073 (___) |
| Involuntary Debtor. | § § § | |

## CORRECTED STATEMENT OF PETITIONING CREDITORS
## IN SUPPORT OF INVOLUNTARY CHAPTER 11 PETITIONS

On January 14, 2021 (the "Petition Date"), AAC Holding Corp. ("AAC Holding"), a debtor and debtor in possession (the "Voluntary Debtor" and, together with its non-debtor subsidiaries and affiliates, the "Company") filed a voluntary petition seeking relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

Prudential Capital Partners IV, L.P., Prudential Capital Partners Management Fund IV, L.P., Prudential Capital Partners (Parallel Fund) IV, L.P. (collectively, "PCP"), and Falcon Strategic Partners IV, LP ("Falcon" and, together with PCP, the "Petitioning Creditors") filed involuntary petitions under chapter 11 of the Bankruptcy Code (the "Involuntary Petitions") against American Achievement Corp. ("AAC"); Commemorative Brands Inc.; Taylor Publishing Company; Iconic Group Inc. ("Iconic"); Taylor Senior Holding Corp.; TP Holding Corp.; Taylor Manufacturing Holdings LLC; Taylor Publishing Manufacturing L.P.; CBI North America Inc.; Gaspard Ltd.; University Cap and Gown Inc.; Willsie Cap and Gown LLC; Braddock Holding LLC; Gaspard & Sons, Inc.; and Gaspard and Sons Mayaguez Inc. (collectively, the "Involuntary Debtors," and with the Voluntary Debtor, the "Debtors"). The Voluntary Debtor is a holding company for the Involuntary Debtors.

The Petitioning Creditors, through the undersigned counsel, hereby submit this statement in support of the Involuntary Petitions (the "Statement"), to inform the Court as follows:

## PRELIMINARY STATEMENT

1.     The Company is a leading publisher of yearbooks, manufacturer and direct marketer of scholastic and graduation products, including jewelry, apparel, and affinity products, and provider of graduation commencement services, including professional graduation photography services, to the scholastic (K-12), collegiate, and associated alumni markets.

2.     As with a multitude of other industries and businesses, the COVID-19 pandemic has had a significant impact on the Company.  The pandemic was a completely unforeseen and unprecedented event that, along with public health measures aimed at combating the pandemic, has severely affected the Company's earnings temporarily.  School graduation products and services have been negatively impacted as high schools and colleges across the United States and Canada prematurely ended semesters, and cancelled or deferred graduation fairs, ring ceremonies, and graduation ceremonies due to public health measures aimed at combating the spread of COVID-19.

3.     Due in large part to growth-spurring investments by PCP and Falcon, the Company had grown into a self-sustaining enterprise.  In particular, prior to the onset of the pandemic, the Company was on track with respect to its business plan and to generate $57 million in EBITDA for fiscal year 2020 (which runs through August 31).  Due to the pandemic, however, the Company's 2020 fiscal year EBITDA dropped to approximately $18 million—a 68% decrease. This precipitous drop was due to the pandemic that caused, among other things, local governmental restrictions on in-person gatherings and disruption to in-person scholastic commencement activities.  The market for graduation products in particular—one of the Company's most profitable markets under normal circumstances—has been impacted on an immense scale.  Due to these unique circumstances, the Company is facing liquidity challenges.

4.      Since their involvement with the Company commenced in 2015, the Petitioning Creditors have been steadfast supporters of the Company, investing over $282 million through a combination of equity and debt investments, while also becoming the Company's lead equity sponsors. In April 2020, as the scope of the pandemic was coming into focus, the Petitioning Creditors again stepped up to the plate, providing $20.5 million of junior capital to the Company in addition to a $5 million backstop of the Company's revolving credit facility, in each case to ensure that the Company could meet its working capital needs.

5.      With vaccinations against the novel coronavirus underway and a macroeconomic recovery and return to normalcy in sight, the Company's future is, once again, bright—as it was immediately before the pandemic occurred. The Company is competitively well-positioned and, in a post-pandemic environment, will resume its growth trajectory, execute on its business plan, and re-commence its efforts to sell its publishing business to effect a robust deleveraging event. At the moment, however, the Company is in default of its secured obligations to its Lenders, led by Cerberus as the majority lender and the collateral agent.

6.      On December 14, 2020, the Company engaged Houlihan Lokey to assist it in negotiations with its creditor constituencies, including the Lenders. Upon learning that the Company had retained an independent financial advisor, however, the Lenders took actions to seize control of the Company. The very next day, in fact, the Lenders purported to vote the pledged shares of the Voluntary Debtor's direct subsidiary, AAC (the immediate holding company to the Company's operating companies), to remove the existing directors and elect two hand-picked replacements loyal to the Lenders—an extreme remedy typically reserved for circumstances in which a board fails to act in the best interests of all stakeholders, which the record here clearly does not support. Subsequently, the new board of AAC purported to replace boards of each of the

Company's downstream subsidiary operating companies with the same two directors.[1] Although the Lenders' actions were largely invalid, they were part of an overall strategy to take advantage of the COVID-19 pandemic by wresting control of the Company at an artificially depressed valuation, to the detriment of the Company and all of its other stakeholders. Accordingly, in addition to addressing the liquidity challenges the Company continues to face, these cases provide an opportunity to ensure the proper allocation and distribution of the Company's value for all of its stakeholders.

7.     PCP and Falcon will be seeking declaratory relief from this Court to resolve existing corporate governance disputes, specifically to affirm that the Lenders' purported action to remove and replace the directors at the Company's operating subsidiaries was invalid, and that the directors that sat on the boards of these entities prior to the Lenders' action remain duly appointed directors of those entities. In addition to providing a forum for a fair and independent governance process and judicial oversight of the Company's affairs, the combination of the chapter 11 case of the Voluntary Debtor with the chapter 11 cases of the Involuntary Debtors (collectively, the "Chapter 11 Cases") will also create an opportunity for badly needed capital to be injected into the Company.

8.     Consistent with their staunch support for the Company, as a showing of their ongoing commitment and based on the unique facts and circumstances of this case, the Petitioning Creditors have offered the Company superpriority debtor-in-possession financing. Among its favorable characteristics, the DIP Financing (as defined below) lacks any case controls or milestones, calls for interest to accrue at one percent (1%) per annum, contains no fees, and does not include any budget compliance or similar testing. The DIP Financing is intended to provide

---

[1]     As described herein, a few weeks later, on January 10, 2021, the Collateral Agent executed a second shareholder consent with purported retroactive effect. For reasons described herein, this subsequent action was ineffectual.

the Company with adequate liquidity to ensure that all vendors, sales representatives, and other critical business partners will remain unimpaired by the bankruptcy process, and is conditioned upon (i) orders for relief being entered against the Involuntary Debtors, who would become guarantors under the DIP Financing documents, and (ii) the replacement of the existing boards of the Voluntary Debtor's subsidiaries with two independent directors that are acceptable to PCP, Falcon, and the Lenders.

9.       Section I provides background information on the Company's businesses, corporate structure, history, and current indebtedness, as well as the Chapter 11 Cases. Section II describes the Company's prepetition restructuring efforts and the events leading up to the filing of the Chapter 11 Cases. Finally, Section III discusses the relationship between the Chapter 11 Cases of the Debtors.

## I.
## BACKGROUND OF THE DEBTORS' BUSINESS AND OPERATIONS

### A.       History of the Company

10.       In the early 1900s, Lloyd Balfour founded L.G. Balfour Co. ("Balfour") as a manufacturer and distributor of fraternity and sorority jewelry. During World War II, Balfour began producing military insignia for the U.S. Armed Forces. In subsequent years, Balfour developed ancillary jewelry, including high school and college rings, as well as printed stationery and diplomas. In September 1988, Balfour was sold to Town & Country Corp., and, in December 1996, Castle Harlan, Inc. acquired Balfour and another class ring business, forming what is now known as AAC. In February 2000, Castle Harlan, Inc. acquired Taylor Publishing, which specializes in publishing scholastic yearbooks, and contributed it to AAC. In January 2004, Castle Harlan, Inc. sold AAC to Fenway Partners.

11.     As described further herein, since 2004, through various investments and acquisitions, the Company has become the most comprehensive provider of scholastic achievement products and services in the United States, which it delivers through state-of-the-art fulfillment technology.  The Company is headquartered in Dallas, Texas and has manufacturing and distribution centers located throughout the United States, Mexico, Canada, and Puerto Rico. The Company's graduation photography business is based in Atlanta, Georgia and photographs events throughout the United States, Canada, and Europe.  PCP and Falcon acquired the photography business in 2018 and subsequently contributed it to the Company in 2019.

12.     Today, the Company's business consists of two main business lines: (i) yearbook publishing and (ii) scholastic and graduation products:

i.      <u>Yearbook Publishing</u>.  In its publishing business, the Company is a leading producer of yearbooks for scholastic (K-12) and collegiate students.  The publishing business accounted for approximately 27% of the Company's 2019 revenue.  Yearbooks constitute the majority of sales, with certain other books (*e.g.*, small-run, high-quality and/or coffee table-type books) produced during the non-academic season.  Yearbooks alone provided for $84 million in revenue in fiscal year 2019, with almost half of this revenue from high school customers.  The publishing business is sensitive to the impact of COVID-19 because, among other things, students are either not in school or have limited interaction due to social distancing guidelines, making it hard to generate content for the yearbook and therefore driving sales down.

ii.     <u>Scholastic & Graduation Products</u>.  The scholastic and graduation products business includes the Company's (a) photography business, (b) jewelry business, including class rings, and (c) apparel and affinity product lines.

a.     *Photography*.  The Company is the leading national provider of collegiate graduation photography under the "GradImages" brand, boasting unparalleled national reach, operational excellence, technology leadership, and marketing experience.  The photography business brought in approximately $50 million in revenue for fiscal year 2019.  Since the Iconic Merger (defined below), the photography business has grown by more than 2,500 high school and collegiate institutional clients and boasts photographing approximately half of all United States college graduates.  The photography business is, however, sensitive to the pandemic-caused limits to in-person gatherings.

b.     *Jewelry*.  The Company's jewelry business delivers class rings and other innovative, custom school-specific affinity jewelry designs to customers.  Overall, this business brings in approximately one-third of the Company's revenue.  Class rings alone account for approximately 70% of the jewelry business, with the Company having about a 45% market share for collegiate sales and approximately 30% market share for high school sales.  In recent years, the Company has fostered a robust extended assortment of jewelry available for browsing and shopping online.

c.     *Apparel & Affinity*.  The Company's apparel and affinity products include caps, gowns, regalia, letter jackets, clergy vestments, choral robes, and customized school logo-specific products such as backpacks, spirit-wear, party supplies, coolers, drinkware, and frames.  Overall, this business provides approximately 14% of the Company's revenue.  Caps and gowns account for approximately 65% of the Apparel & Affinity business line.  Over the last few years, the Company has begun offering certain of these products for online purchase.  Unsurprisingly, this business line is also sensitive to the pandemic's effect on in-person gatherings.

13.     While the Company has two major competitors, it is uniquely situated as the only company that can provide the "full package" of products and services for scholastic achievement events at both the high school and college levels.

### B.    PCP and Falcon's Involvement

14.     In 2015, PCP and Falcon invested in the Company in furtherance of its continued investment in product innovation, technology, and salesforce support.  As described above, prior to 2015, the Company was mainly a manufacturing company focused on high school rings and yearbooks.  Although the Company was generally successful in this area, its prior sponsor did not inject sufficient capital into the business to continue its growth.  For example, before 2015 there had been no new product launches in 15 years and all customer orders were still conducted in person—via folding tables in schools—without sales or marketing teams to support these efforts. The Company's online presence was also in need of investment, as its website did not optimize user experience, nor did the Company capitalize on email marketing or alumni databases.  Instead of developing the business, the former management team cut selling, general, and administrative ("SG&A") expenses drastically.  PCP and Falcon became involved and moved the Company towards a growth mindset.

15.     In July 2015, the Company acquired Gaspard LP, a leading North American manufacturer and distributor of academic regalia, clergy vestments, choral robes, and legal and judicial attire.  Then, in September 2015, PCP and Falcon invested approximately $111 million in the Company in the form of OpCo Subordinated Notes (as defined below) and preferred equity as part of refinancing the Company's balance sheet and the Gaspard acquisition.  Prior to the acquisition, AAC did not produce or supply caps and gowns for commencement ceremonies and instead relied on suppliers to provide these products to AAC customers.  A large part of PCP and Falcon's underwriting in September 2015 focused on improving AAC's ability to supply its own

caps and gowns, because this area is a growth segment for the Company and represents one of the three pillars of the Company's "all-in" collegiate commencement strategy, as described above.

16. After the refinancing and during this time of transition, PCP and Falcon recruited a new CEO with significant digital experience. In March 2016, Bob Myers, the current President and CEO of the Company, stepped into his position. Under Mr. Myers' guidance, the Company recruited new management members and developed a plan to transform the Company by, among other things, introducing new products for the first time in over a decade and developing digital platforms for distribution of such products.

17. In February 2017, PCP and Falcon invested an additional $20 million to fund the Company's capital expenditures as it rapidly invested in digital transformation. The Company's emerging digital platform included, among other things: (i) launching more than 135 school websites; (ii) revamping its digital marketing campaign; (iii) integrating customer relationship management technology; and (iv) prioritizing mobile-first technology. During this time, PCP and Falcon assumed the role as the Company's lead equity sponsors. Thereafter, PCP and Falcon have repeatedly invested in and supported the Company for the benefit of its Lenders and all other stakeholders.

18. For example, in May 2018, PCP and Falcon spent approximately $64 million to acquire the Iconic business. When PCP and Falcon acquired the Iconic business, they were under no obligation to contribute it to the Company. However, a year later, in May 2019, in order to realize on synergies between Iconic and the Company, PCP and Falcon merged Iconic into AAC (the "Iconic Merger") to provide an "all-in" collegiate commencement package for the Company's customers. As part of the Iconic Merger, PCP and Falcon caused the following key actions to occur:

- Iconic, which was wholly owned by PCP and Falcon and therefore out of the Lenders' reach, became part of the credit group that secures the OpCo Credit Facility (as defined below);

- PCP and Falcon invested an additional $35.3 million in the enterprise through the purchase of preferred equity to complete the integration and fund one-time costs to realize cost synergies related to the Iconic Merger;

- $27 million of Iconic's senior subordinated promissory notes were exchanged for OpCo Subordinated Notes (as defined below); and

- PCP and Falcon agreed to receive interest on the OpCo Subordinated Notes—now with $121 million of principal amount outstanding—paid-in-kind rather than in cash.

19.     In August and September of 2018, PCP and Falcon invested an additional $20 million in the aggregate in the Company through the acquisition of preferred equity to fund overages in digital investments and ensure the Company had adequate liquidity during this time of growth.

20.     In addition to various rounds of investments to fund the Company's strategic acquisitions, PCP and Falcon have continually supported the Company's other financial needs.  In October 2019, PCP and Falcon invested $5 million to provide liquidity support as the Company implemented its business plan and, in February 2020, PCP and Falcon invested an additional $6 million to support the Company's acquisition of another photography business.  These capital infusions were made through the sale of HoldCo Subordinated Notes (as defined below) and guarantees of the Company's borrowings of the HoldCo Subordinated Term Loan (as defined below).

21.     In April 2020, as the initial effects of the COVID-19 pandemic on the economy were beginning to manifest, PCP and Falcon stepped up once again to shore up the Company's balance sheet in anticipation of an impending market slowdown.  PCP and Falcon invested $20.5 million via the purchase of preferred equity to fund (i) a $13 million pay-down of the OpCo Revolving

Credit Facility (as defined below), and (ii) a $7.5 million prepayment of cash interest on the OpCo

Term Loan (as defined below). PCP and Falcon also agreed to backstop $5 million of the OpCo

Revolving Credit Facility to ensure that the Company's working capital needs were met. At this

time, the Lenders agreed to receive payment-in-kind for 40% of cash interest owed on the OpCo

Credit Facility through December 2020—the first time the Lenders would ever forego monthly

cash interest payments—and defer quarterly amortization payments from June through December

2020.

22.     In total, PCP and Falcon invested $262 million in the Company before the COVID-

19 pandemic shut down more than half of the Company's business. During the pandemic, PCP

and Falcon provided an additional $25.5 million through new money investments and

guarantees—capital that is crucial to the Company's ability to operate as a going concern. These

investments, described above, are summarized in the following table:

| Date | Amount | | Form | Reason |
|---|---|---|---|---|
| | *PCP* | *Falcon* | | |
| Sept. 2015 | $71,557,107.00 | $40,000,000.00 | OpCo Subordinated Notes; Preferred Equity | 2015 refinancing of Company's balance sheet and Gaspard acquisition |
| Feb. 2017 | $12,828,784.99 | $7,171,215.01 | Preferred Equity | Investments in digital infrastructure |
| May 2018 | $40,875,716.18 | $22,849,283.82 | OpCo Subordinated Notes; Preferred Equity | Acquisition of Iconic |
| Aug. 2018 | $3,207,196.25 | $1,792,803.75 | Preferred Equity | Investments in digital infrastructure |
| Sept. 2018 | $9,621,588.74 | $5,378,411.26 | Preferred Equity | General corporate purposes |
| May 2019 | $22,642,805.51 | $12,657,194.49 | Preferred Equity | Iconic Merger |
| Oct. 2019 | $3,207,196.25 | | HoldCo Subordinated Notes | Liquidity support |
| | | $1,792,803.75 | Guarantee of HoldCo Term Loan | Liquidity support |
| Feb. 2020 | $3,848,635.50 | | HoldCo Subordinated Notes | Liquidity support |
| | | $2,151,364.50 | Guarantee of HoldCo Subordinated Term Loan | Liquidity support |
| Apr. 2020 | $13,149,504.62 | | HoldCo Subordinated Notes | Liquidity support |
| | | $6,722,084.12 | Guarantee of HoldCo Subordinated Term Loan | Liquidity support |
| **Total** | **$180,938,535.04** | **$101,143,571.96** | | |
| **Grand Total** | **$282,082,107.00** | | | |

Note row Apr. 2020 Falcon HoldCo Subordinated Notes: $628,411.26

## C. The Company Post-COVID-19

23. With worldwide distribution of the COVID-19 vaccine now under way, a return to normalcy is within sight. The Company expects that revenues and EBITDA will be normalized post-COVID-19. For example:

- Student graduation participant count by year has not decreased; the only issue is that events are cancelled due to the pandemic and related restrictions on in-person gatherings. The number of graduating students is known due to the "locked-in" nature of the Company's agreements and direct contacts with academic institutions.

- The Iconic photography business continues to grow and expand its customer base. The recent acquisition of Commencement Photos Inc. also will provide an incremental 77 colleges under contract that have not yet converted to sales due to commencement cancellations.

- The jewelry business continues to improve, with two new partnerships for graduation jewelry lines adding an incremental 1,105 colleges and universities to the Company's customer base. The Company has not suffered any customer losses in this area during the pandemic shutdown.

- The Taylor Publishing business has experienced substantial margin growth in 2020 despite the pandemic and remains a valuable asset with superior technology as compared to the Company's competitors. Yearbook publishing is a highly profitable stand-alone business with predictable revenue demand driven by (i) multi-year contracts with high school customers, (ii) high renewal rates, and (iii) reoccurring purchase patterns. A sale of the publishing business, although unsuccessful during the pandemic, remains a viable strategy to deleverage the business post-COVID-19.

24.    Due in large part to PCP and Falcon's capital infusions, and after years of investments and upgrades, the Company is now positioned for robust sales and EBITDA increases as the pandemic starts to subside—picking up the trajectory where it left off. The COVID-19 pandemic is the only reason the Company is not performing as projected—prior to the onset of the pandemic, the Company launched various new, exclusive products and established a sophisticated digital-marketing platform and potential customer alumni database. All of the Company's upfront investments in these products have been made, so SG&A and capital expenditures will remain flat going forward. Lastly, the Company's management team is highly skilled, dedicated, and invested in the Company's success, as is evidenced by the Company's business plan that was already implemented and well on-track before it was abruptly hindered by the COVID-19 pandemic. As demonstrated by multiple financing proposals made to the Lenders prior to the commencement of the Chapter 11 Cases, PCP and Falcon remain committed to supporting the Company so it may capitalize on the substantial benefits that lie before it.

D. **The Company's Corporate Structure**

25. As described above, AAC Holding owns 100% of the equity of AAC. Above AAC sit five holding companies, including the Voluntary Debtor, each owned 100% by the entity above it. The ultimate holding company is AAC Iconic Holdings LLC, which has issued notes held by PCP and Falcon.

26. AAC owns 100% of certain Involuntary Debtor operating companies, including Iconic (graduation photography business), Taylor Senior Holding Corp. (main publishing business and producer of yearbooks), Braddock Holding LLC (owns 100% of Gaspard Ltd., which leads the cap and gown sector), and Commemorative Brands, Inc. (producer of rings, graduation-related products, and affinity products). The Company's revenues are generated by these operating companies and their subsidiaries, certain of which are Involuntary Debtors.

27. A chart illustrating the Company's organizational and capital structures as of the Petition Date is attached hereto as **Exhibit A**.

E. **The Company's Capital Structure**

28. As set forth below, as of the Petition Date, the Company has outstanding funded debt obligations of approximately $494 million, which consist of approximately:

- $339 million in secured borrowings under the OpCo Term Loan (as defined below);

- an undrawn OpCo Revolving Credit Facility (as defined below);

- $124 million in principal amount of OpCo Subordinated Notes (as defined below);

- $21 million in principal amount of HoldCo Subordinated Notes (as defined below);

- $11 million in principal amount of the HoldCo Subordinated Term Loan (as defined below); and

- approximately $5 million in additional unsecured obligations of the Company's operating entities.

i.    Equity Ownership

29.    As detailed above, PCP and Falcon are active equity sponsors of the Company, owning collectively 97% of the Company's preferred units and 94% of its common units. The remaining equity of the Company is held by certain third parties.

i.    Secured Obligations of Involuntary Debtors

30.    In September 2015, the Company, on a consolidated basis with its subsidiaries, completed a recapitalization and refinancing of its outstanding debt and equity. In connection with the refinancing and recapitalization, AAC, Commemorative Brands, Inc., and Taylor Publishing Company, as borrowers, and AAC Holding Corp. and its other domestic subsidiaries, as guarantors, entered into a new senior secured credit facility in an amount of up to $355 million (the "OpCo Credit Facility") due September 30, 2022.[2] The OpCo Credit Facility consists of a revolving line of credit in an amount of up to $25 million (including any issued letters of credit not to exceed $5 million) (the "OpCo Revolving Credit Facility"), which has not been drawn as of the Petition Date, and a term loan in the amount of $330 million (the "OpCo Term Loan"). Obligations under the OpCo Credit Facility are secured by substantially all assets of the Company, are subject to various financial covenants, and are subject to excess cash flow sweeps as set forth in that certain Financing Agreement, dated as of September 30, 2015, by and among AAC Holding Corp., American Achievement Corporation, the other borrowers and guarantors thereunder, and the lenders from time to time party thereto (as amended, restated, supplemented, modified, or otherwise changed from time to time, the "Financing Agreement").

31.    In May 2019, in connection with the Iconic Merger, American Achievement Group Holding Corp. amended the terms of the OpCo Credit Facility. In connection with the amendment,

---

[2]    Each of the Involuntary Debtors is an obligor under the Credit Facility.

the lenders under the Financing Agreement (the "Lenders") increased the OpCo Term Loan borrowing by $30 million, increased the availability under the OpCo Revolving Credit Facility from $25 million up to $30 million (including any letters of credit not to exceed $8 million), and extended the maturity date through September 30, 2022.

32.     In November 2019, the Company again amended and restated the OpCo Credit Facility to allow for additional term loan borrowings of $30 million and reducing the availability under the line of credit from $30 million to $25 million.

33.     As of the date hereof, the amount outstanding under the OpCo Term Loan is approximately $339 million.

i.      Unsecured Obligations

34.     In 2015, pursuant to a securities purchase agreement (as amended from time to time, the "Securities Purchase Agreement"), AAC, Iconic Group, Inc., Taylor Publishing Company, and Commemorative Brands, Inc. (the "OpCo Subordinated Notes Issuers"), each of which is an Involuntary Debtor, issued $65 million of unsecured 14% senior subordinated notes (the "OpCo Subordinated Notes" and the claims in respect thereof, the "OpCo Subordinated Notes Claims") to PCP and Falcon.[3]  In addition to being guaranteed by the OpCo Credit Facility Guarantors (including the Voluntary Debtor), the OpCo Subordinated Notes are also guaranteed by AAC Iconic Holdings LLC, AAC Iconic Intermediate Holdings LLC, American Achievement Group Holding Corp., American Achievement Intermediate Holding Corp., and AAC Group Holding Corp.  Initially, the OpCo Subordinated Notes were to mature on March 30, 2021 and bore an interest rate of 14% per annum.

---

[3]     The OpCo Subordinated Notes Issuers are the borrowers under the Credit Facility, with the exception of Iconic Group, Inc. which is an OpCo Subordinated Notes Issuer but a guarantor under the Credit Facility.

35. As stated above, in May 2019, in connection with the Iconic Merger, the Company modified the terms of its outstanding OpCo Subordinated Notes. As a result, the applicable interest rate was reduced to 8%, all of which is paid-in-kind and added to the outstanding principal amount of the debt. The maturity date was also extended to September 30, 2023. PCP and Falcon hold all of the OpCo Subordinated Notes. As of the date hereof, approximately $124 million of OpCo Subordinated Notes is issued and outstanding.

36. In connection with the issuance of the OpCo Subordinated Notes, PCP, Falcon, and Cerberus Business Finance, LLC, as Collateral Agent for the Credit Facility ("Cerberus" or the "Collateral Agent"), are parties to the Amended and Restated Subordination Agreement dated as of May 7, 2019 (the "Subordination Agreement"). The Subordination Agreement provides, among other things, that payment of the OpCo Subordinated Notes is subordinated in right of payment to "Senior Debt," which includes all obligations under the Financing Agreement (including any post-petition interest and adequate protection payments), until all such Senior Debt is paid in full in cash (or such other consideration as is voluntarily accepted by the Lenders). The Subordination Agreement also provides that PCP and Falcon cannot Commence Legal Action (as such term is defined in the Subordination Agreement) unless (i) 180 days have passed since the delivery of a notice to the Collateral Agent that an event of default has occurred under the OpCo Subordinated Notes that entitles PCP and Falcon to accelerate the maturity, (ii) the Collateral Agent or other Lenders Commence Legal Action, or (iii) an "Insolvency Proceeding" has been commenced relating to any of AAC, Voluntary Debtor AAC Holding Corp., or any borrower or guarantor under the Financing Agreement.[4] By the chapter 11 case of the Voluntary Debtor, an applicable Insolvency Proceeding has been commenced.

---

[4] The Subordination Agreement defines "Insolvency Proceeding" as any proceeding commenced by or against any of AAC, Voluntary Debtor AAC Holding Corp., and each other borrower or guarantor

37. Beginning in late 2019 and continuing throughout 2020, to bolster the Company's liquidity position, PCP and Falcon again stepped to the plate for various rounds of capital infusions. To this end, PCP and Falcon engaged in the following transactions:

- On October 1, 2019, PCP purchased $3.2 million of promissory notes issued by AAC Iconic Holdings LLC (the "HoldCo Subordinated Notes"). The HoldCo Subordinated Notes mature on October 1, 2022 and accrue interest at the greater of (i) the prime rate minus one and one-quarter percent or (ii) zero percent. The HoldCo Subordinated Notes are solely an obligation of non-debtor AAC Iconic Holdings LLC.

- Contemporaneously with the issuance of the HoldCo Subordinated Notes, a third-party lender loaned $1.7 million to AAC Iconic Holdings LLC (the "HoldCo Subordinated Term Loan") on behalf of Falcon. Falcon guaranteed the HoldCo Subordinated Term Loan in its entirety.

- In February 2020, PCP purchased an additional $3.8 million of HoldCo Subordinated Notes and the third-party lender increased the amount of the HoldCo Subordinated Term Loan by $2.1 million, which was again fully guaranteed by Falcon.

- In April 2020, PCP purchased an additional $13.1 million of HoldCo Subordinated Notes, Falcon purchased $638,000 of HoldCo Subordinated Notes, and the third-party lender increased the amount of the HoldCo Subordinated Term Loan by $6.7 million, which was again fully guaranteed by Falcon.

38. Despite all of the Company's difficulties since the COVID-19 pandemic began, PCP and Falcon have consistently supported the Company's needs. Because of this, the Company did not miss any interest payments owed to the Lenders—totaling over $150 million—until the recently missed payment on January 4, 2021.

---

under the Financing Agreement under any provision of the Bankruptcy Code or any other state, federal, or foreign bankruptcy or insolvency law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors or proceedings seeking reorganization, arrangement, court protection, or other similar relief (including the appointment of a trustee or similar officer).

**II.**
**PREPETITION RESTRUCTURING EFFORTS AND EVENTS LEADING**
**TO THE CHAPTER 11 CASES**

39.     Notwithstanding its core operating strengths, like many enterprises across the market, the Company has been adversely impacted by the COVID-19 pandemic.  The rapid and unprecedented spread of COVID-19, the ensuing uncertainty regarding its long-term implications, including whether there might be potential subsequent waves of the pandemic, the imposition of travel restrictions, the restrictions on the ability of large groups to gather, and the shutting down of academic and other institutions across the United States, have caused a substantial decline in the demand for the Company's products and services.

40.     For example, as a result of the reduced demand and pandemic-related restrictions, most of the Company's customers have temporarily ceased and/or severely reduced commencement-related activities.  The impact on the Company's operations and cash flows, which are directly linked to these activities, has been significant.

**B.      Prepetition Efforts to Combat Market Downturn**

41.     At the beginning of the COVID-19 pandemic, the Company—like many other market participants—assumed it would impact only the 2020 commencement season.  To weather what were thought to be short-term challenges and in order to address its senior debt burden, at the insistence of the Lenders, the Company continued its pre-existing efforts to sell its publishing business, including Taylor Publishing Company and its subsidiaries.  In March 2020, the Company retained BMO Capital Markets Corp., as financial advisor, to pursue the sale of the publishing business through a recapitalization, consolidation, joint venture, tender offer, merger, or a sale of all or substantially all of the assets.  By its mandate, BMO Capital Markets Corp. was to assist the Company in all respects concerning a potential sale of the publishing business including by, among other things, (i) developing a list of possible purchasers of the publishing business, (ii) preparing

an offering memorandum, marketing materials, and transaction proposals, and (iii) presenting proposed transactions to the Company's board of directors.

42. In connection with pursuing a sale of the publishing business, parties to the Financing Agreement entered into the Seventh Amendment to the Financing Agreement, which contained the following milestones in respect of the contemplated sale:

- Distribution of customary marketing materials related to the sale to potential buyers on or before June 30, 2020;

- Receipt of a non-binding letter of intent, term sheet, or other written proposal for the sale on or before August 31, 2020;

- Receipt of one or more final bids for the sale on or before September 30, 2020;

- Entrance into a definitive agreement governing the sale on or before November 15, 2020; and

- Consummation of the sale on or before December 18, 2020 (which date was to be automatically extended to March 31, 2021 if antitrust approval was not obtained prior to December 18, 2020).

43. The Seventh Amendment to the Financing Agreement, executed on March 31, 2020, also provided the Company with certain covenant relief under the Credit Facility so long as the Company remained in compliance with the sale milestones.

44. These milestones were agreed upon at the beginning of the pandemic with the information the parties had at the time—at the time, no one was aware of how long the pandemic would last and how drastic an impact it would have on the Company and the attempted sale. Once that became clear, however, the parties began working towards a revised budget that would take the COVID-19 implications into account and expected to pick up the sale process at a later date.

45. In April 2020, to help the Company through the pandemic-related business slowdown, PCP and Falcon injected an additional $20.5 million into the Company. This capital infusion went towards paying down the entire balance of the OpCo Revolving Credit Facility and

prepaying over half of the interest due to the Lenders through the end 2020, with the remainder to be paid-in-kind during such period. Additionally, to provide the Company with additional liquidity, PCP and Falcon agreed to guarantee borrowings under the OpCo Revolving Credit Facility up to $5 million.

46.     As previously noted, due to the severity of pandemic-related market disruptions and despite best efforts, the Company decided to postpone the sale of the publishing business. The Company, PCP, and Falcon are optimistic that a sale of the publishing business is still viable in a non-pandemic environment, which would provide a substantial capital infusion for the Company and facilitate the repayment of the Lenders' debt. Due to the missed milestones, however, the Company has been in default of the Financing Agreement since August 31, 2020.

47.     In September 2020, to generate liquidity, the Company entered into a sale-leaseback transaction with respect to its headquarters and main manufacturing location in Dallas, Texas. The sale involved Involuntary Debtor Taylor Publishing Company, as seller and lessee. This transaction brought in approximately $20 million of capital for the Company and enjoyed the support of all of the Company's stakeholders, including the Lenders.

### C.      Prepetition Lender Negotiations

48.     Following the occurrence of the milestone-related events of default under the Financing Agreement, in November 2020, PCP and Falcon approached the Lenders with a refinancing proposal. Without disclosing the substance of settlement discussions, the parties were unable to reach agreement on a proposal.

49.     In mid-December 2020, the Company retained Houlihan Lokey ("Houlihan") to provide independent guidance in further negotiations with the Lenders. Shortly thereafter, the Collateral Agent, on behalf of the Lenders, exercised certain remedies whereby it purported to

seize control of the boards of directors of the Company's operating entities, and immediately fired Houlihan.

50.     On December 15, 2020, the Collateral Agent, on behalf of the Lenders, purported to vote all shares of AAC via proxy to remove all members of the board of directors of American Achievement Corporation and install Bradley Dietz and Don MacKenzie as replacement directors (the "Lender Directors").   These actions are part of a campaign to redirect the Company's considerable equity value to the Lenders' benefit at a depressed valuation based upon the significant, but temporary, COVID-19-caused earnings disruption.  The documentation appointing the Lender Directors asserts that the Lender Directors hold the sole authority to act on behalf of the Company's operating subsidiaries, and expressly prohibits these entities from taking any actions, including filing for bankruptcy protection, without the express approval of the Lender Directors.  The next day, on December 16, 2020, the Lenders delivered a written consent of the Lender Directors purporting to reduce the size of the board of directors of each operating entity of the Company to two directors or managers, as applicable, and appointing Mr. Dietz and Mr. MacKenzie to serve in such positions.

51.     Weeks later, on January 10, 2021, in a further ineffective action, the Collateral Agent executed a second shareholder consent, purporting to amend AAC's bylaws to reduce the number of directors from seven to two, with purported retroactive effect to December 15, 2020. However, for the reasons discussed below, the Collateral Agent's effort to take control of AAC's board of directors left that board short of a quorum and thus unable to operate.  The Collateral Agent's later actions failed to remedy the original ineffective actions and, thus, the boards of the Company's operating subsidiaries remain unchanged.

52. In late December 2020, in an attempt to revive negotiations and reach a commercial resolution, PCP and Falcon again approached the Lenders with a revised proposal. Again, the parties were unable to reach agreement.

### III.
### THE CHAPTER 11 CASES

53. As described throughout this Statement, the Company is poised to become a highly profitable market leader in the collegiate commencement and related industries in a post-COVID-19 world. Faced with the twin challenges of the Lenders' creeping enforcement actions and the Company's liquidity challenges, bankruptcy protection is appropriate for this enterprise to reorganize for the benefit of all of its stakeholders. The Chapter 11 Cases will enable the Company to gain access to capital, protect its dwindling liquidity, and stay the Lenders' enforcement actions for the benefit of all the Company's stakeholders.

### A. Corporate Governance Declaratory Relief

54. Contemporaneously with the filing of the Chapter 11 Cases, PCP, Falcon, and the Voluntary Debtor jointly filed a complaint seeking declaratory relief from this Court to affirm that the December 16 resolution purporting to remove and replace the subsidiaries' directors is invalid, and that the directors seated at AAC's subsidiaries prior to that resolution remain duly appointed directors of those entities, respectively (the "Adversary Complaint").

55. As set forth in the Adversary Complaint, the Written Consent of the Board of Directors of American Achievement Corporation, dated as of December 16, 2020, was ineffective because the Lender Directors did not have the authority under the Company's by-laws—which require a quorum (based on the number of board seats) to act—to remove the directors of AAC's subsidiaries or install new directors. Moreover, the Delaware General Corporation Law ("DGCL") requires a quorum of at least one-third of the board (here, three directors) to take any action. By

installing only two directors, and removing the others, the Collateral Agent effectively incapacitated AAC's board.  As currently constituted, it cannot take any action for the Company, including removing and installing directors at AAC's subsidiaries.  In addition, even if there were a quorum on December 16—and there was not—a resolution by AAC's board is not enough under the DGCL to replace the directors of all of AAC's subsidiaries.  That can be accomplished only at a stockholder meeting for each applicable subsidiary or through the execution of valid written stockholder consents (as to which the Collateral Agent holds irrevocable proxies), none of which has occurred.

56.     Additionally, the Collateral Agent's further actions on January 10, 2021 failed to cure the defects of the December 16 board resolution.  As a matter of law, the January 10 stockholder resolution could not retroactively give the board power that it did not have on December 16.  Furthermore, the January 10 stockholder resolution merely changed the number of directorships on AAC's board going forward; it did not purport to remove or replace directors at any of AAC's subsidiaries.

57.     The Collateral Agent's actions, while ineffective, had a purpose that went beyond routine corporate governance.  The Collateral Agent is itself the largest lender to AAC.  The Collateral Agent and the other Lenders know very well that AAC's business is sound and more valuable than its temporarily depressed performance would imply.  And the Collateral Agent and the Lenders also know that if they manage to foreclose on their collateral now, and orchestrate a sale of (or credit bid for) AAC's assets, the Lenders could either be paid in full or take over this valuable business outright, while all other stakeholders—junior creditors and AAC's equity holders—come away with nothing, or pennies on the dollar for the hundreds of millions of dollars they have invested in the business over time.

58. The Adversary Complaint coupled with the automatic stay will allow the Company to focus on pursuing an organized, value-maximizing restructuring for the benefit of *all* stakeholders.

**B. Proposed Post-Petition Financing**

59. As discussed herein, the Voluntary Debtor has requested debtor in possession financing (the "DIP Financing") in the amount of $35 million. The DIP Financing, which is subject to the Court's approval and better offers, together with the use of cash collateral, will provide the Company with the liquidity to fund its operations, administer the Chapter 11 Cases, and to maximize value for all stakeholders.

60. Given their deep commitment to the success of the enterprise, and in a stark departure from "market" practices, PCP and Falcon are prepared to offer DIP Financing on highly favorable terms to the Company. The DIP Financing is unique for a post-petition financing facility of its size in that, among other things, (i) it is extremely inexpensive, lacking any fees and with amounts outstanding bearing interest at only 1.00% per annum, (ii) it lacks any case controls, and (iii) borrowing under the facility is not based on budget compliance or similar testing.

61. The DIP Financing provides a vehicle for the Company as a whole to pursue a successful reorganization of the business and sends a strong message to the Company's customers, vendors, employees, and contract counterparties regarding the sufficient funding of the Company's operations. Moreover, PCP and Falcon have consented to the Company pursuing any better financing offers that may be made.

## CONCLUSION

Based on the above, and such evidence as may be adduced at trial, the Petitioning Creditors respectfully request that the Court grant such relief as may be appropriate under the circumstances.

Dated: January 14, 2021       /s/ Jason S. Brookner
       Dallas, Texas              Jason S. Brookner

Texas Bar No. 24033684
Lydia R. Webb
Texas Bar No. 24083758
**GRAY REED & McGRAW LLP**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332
Email: jbrookner@grayreed.com
      lwebb@grayreed.com

-and-

Paul M. Basta (*pro hac vice* pending)
Lewis R. Clayton (*pro hac vice* pending)
Robert A. Britton (*pro hac vice* pending)
William A. Clareman (*pro hac vice* pending)
Sean A. Mitchell (*pro hac vice* pending)
**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: pbasta@paulweiss.com
      lclayton@paulweiss.com
      rbritton@paulweiss.com
      wclareman@paulweiss.com
      smitchell@paulweiss.com

*Counsel to Prudential Capital Partners IV, L.P.,
Prudential Capital Partners Management Fund IV,
L.P., Prudential Capital Partners (Parallel Fund) IV,
L.P., and Falcon Strategic Partners IV, LP, as
Petitioning Creditors*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 14th day of January, 2021 he caused the foregoing pleading to be served (i) via the Court's CM-ECF Notification System on those parties who have subscribed for notice and (ii) via electronic mail on the parties listed below.

| | | |
|---|---|---|
| Laura Davis Jones | Adam Harris | Susan B. Hersh |
| Pachulski Stang Ziehl & Jones LLP | Schulte Roth & Zabel LLP | Susan B. Hersh, P.C. |
| 919 North Market Street | 919 Third Avenue | 12770 Coit Road, Suite 1100 |
| 17th Floor | New York, NY 10022 | Dallas, Texas 75251 |
| Wilmington, DE 19801 | adam.harris@srz.com | susan@susanbhershpc.com |
| ljones@pszjlaw.com | | |
| | | |
| *Counsel to Involuntary Debtors* | *Counsel to Cerberus Business Finance, LLC* | *Counsel to AAC Holding Corp.* |

/s/ Jason S. Brookner _____
Jason S. Brookner

## **EXHIBIT A**

**Corporate Organizational Chart**



aac
american achievement corporation

# American Achievement Corporate Structure

* Unless noted otherwise, all entities formed in Delaware.

**Equity Pledge covers 65/66% of outstanding equity.

